SUPREME GRAND LODGE OF LOYAL ORANGE INSTITUTION
OF THE UNITED STATES *v.* GRAND LODGE OF
LOYAL ORANGE INSTITUTION OF MICHIGAN.

1. JUDGMENT—RES ADJUDICATA.

In a suit by the Supreme Lodge of Orangemen to enjoin
the Grand Lodge of Orangemen of this State from using
said name because not properly chartered by it, and owing
allegiance to a rival Supreme Lodge, a suit in another
jurisdiction between the rival Supreme Lodges, in which
plaintiff was held to be the true Supreme Lodge, *held*, to
be *res adjudicata* of the instant case, entitling it to a
decree.

2. BENEFICIAL ASSOCIATIONS—LACHES—INJUNCTION.

Where a suit to enjoin the Grand Lodge of Orangemen of
this State from using said name because not properly
chartered by the Supreme Lodge was instituted within
three months after it was incorporated, there was no
laches, although there had been a schism in the Supreme
Lodge of said order for 11 years, with subordinate lodges
adhering to each faction, where it further appears that the
Grand Lodge of this State was dormant most of that time,
and the true Supreme Lodge had been legally determined
but a short time previously.

Appeal from Wayne; Covert (Frank L.), J., pre-
siding.    Submitted June 14, 1927.    (Docket No. 88.)
Decided July 29, 1927.

Bill by the Supreme Grand Lodge of the Loyal
Orange Institution of the United States of America
and another against the Grand Lodge of the Loyal

---

[1]Judgments, 34 C. J. § 1611; [2]Injunctions, 32 C. J. § 54.
*Continued from Vol. 239.

Orange Institution of the State of Michigan to enjoin the use of defendant's name. From a decree for plaintiffs, defendant appeals. Affirmed.

*George B. Murphy* and *Frederick Miller,* for plaintiffs.

*Shirley Stewart* (*Eugene F. Black* and *E. Newell DeGurse,* of counsel), for defendant.

An order composed of Orangemen has existed in the United States for upwards of 75 years. The governing body nationally is known as the Supreme Grand Lodge of the Loyal Orange Institution of the United States of America. It will hereafter be referred to as the Supreme Lodge. The State governing body will hereafter be referred to as the Grand Lodge. There are district and subordinate lodges. The Supreme Lodge meets biennially. At its meeting held at Niagara Falls, N. Y., in 1914, a schism occurred. One faction aligned itself with one Kirkland and has since been known as the "Kirkland faction." The other aligned itself with one Lemmon and has since been known as the "Lemmon faction." Each faction claims to be the true Supreme Lodge of the order. There has been considerable litigation in other States, but the record fairly discloses that for some time the brethren in Michigan seem not to have become overheated by the factional disturbance, but rather to have entertained a conscientious desire to learn which faction was the true one, which was the governing body nationally. At times some were with the Kirkland faction and at other times they were with the Lemmon faction. Some subordinate lodges went with the Kirkland faction and others went with the Lemmon faction. At the time of the hearing of the case there were 41 lodges adhering to Kirkland and 11 adhering to Lemmon. On June 25, 1895, the Grand Lodge of

this State was incorporated under Act No. 55, Pub. Acts 1895 (2 Comp. Laws 1915, § 10269 *et seq.*).  Its corporate existence was fixed at 30 years.  It was suspended by the Supreme Lodge in 1908 and remained dormant until 1919.  In 1921, there was held at Pontiac a meeting of representatives of both factions in this State in an attempt to conciliate their differences.  It proved unsuccessful.  On March 4, 1925, representatives of the Lemmon faction in this State, purporting to be the Grand Lodge and holding a charter from the Lemmon Supreme Lodge, passed a resolution dissolving the corporation organized in 1895, and on March 17th filed articles with the secretary of State incorporating the defendant Grand Lodge. This bill was filed shortly thereafter.

The Imperial or Triennial Orange Council of the World meets each three years.  Its meetings appear to be held at different points in Canada.  In 1923 it met in Winnipeg.  It is claimed by defendant that it has superior jurisdiction to that of the Supreme Lodge, but its constitution does not, we think, authorize it to settle any disputes except such as are submitted to it for arbitration.  Both factions sent representatives to the Winnipeg meeting.  Those representing the Lemmon faction were clothed with authority to submit the differences to that body; those representing the Kirkland faction were not.  Both, however, seem to have improved the opportunity to make speeches and probably air their differences.  The Imperial Council sided with the Lemmon faction. Following this the plaintiff here, Supreme Lodge, instituted proceedings in the circuit court of Baltimore city, Maryland, against the (Lemmon) Grand Lodge, of that State to settle differences existing between the factions.  The (Lemmon) Supreme Lodge, through its officers, intervened and were made defendants.  The schism at Niagara Falls, the action of the

Imperial Council and the differences between the factions were gone into, substantially the same testimony being given as in the instant case. The claims of the present · plaintiff (Kirkland) Supreme Lodge were sustained, its right to the use of the name upheld and an appropriate injunction decreed. From this decree there was no appeal.

FELLOWS, J. (*after stating the facts*). Two questions of law are submitted on this appeal:

(1) Is the decree of the Baltimore court *res adjudicata*, and

(2) Is plaintiff precluded from asserting its claim by reason of laches?

The detailed statement we have made is applicable to the second question.

1. The Kirkland Supreme Lodge and the Lemmon Supreme Lodge each submitted to the Baltimore court its claim to the use of the name "The Supreme Grand Lodge of the Loyal Orange Institution of the United States of America;" each submitted its testimony to sustain such claim and the case was decided on its merits. The defendant·in the instant case claims by, through and under the Lemmon Supreme Lodge. To become incorporated and as a prerequisite to incorporation, it had to be "duly chartered" by the "Supreme Grand Orange Lodge of the United States (2 Comp. Laws 1915, § 10270)." It was chartered by the Lemmon Supreme Lodge. It was, therefore, in privity with the Lemmon Supreme Lodge, indeed, it was but an agency of the Lemmon Supreme Lodge. It owed its existence to it; it owed its allegiance to it and was a part and a parcel of it. When the Baltimore court decreed that the Kirkland Supreme Lodge was the true order, and the Lemmon faction were secessionists and were not entitled to use the name or to hold themselves out as the order of Orangemen, that bound the

Lemmon Supreme Lodge, its officers, privies, and agents.    The supreme court of Pennsylvania, in *Commonwealth, ex rel. McClintock,* v. *Kelly,* 287 Pa. 139 (134 Atl. 514), had this precise question before it, and it is the only decision of a court of last resort which has been called to our attention dealing with it.    In an exhaustive opinion it held that the decree of the Baltimore court was *res adjudicata,* and awarded to the Kirkland faction the control of the home for aged and infirm members of the order located in that State.    We are content with the reasoning of that opinion, and here hold that the decree of the Baltimore court is *res adjudicata.*

2. The point most earnestly stressed in this court by defendant's counsel is laches.    He relies particularly on *Grand Lodge A. O. U. W.* v. *Graham,* 96 Iowa, 592 (65 N. W. 837, 31 L. R. A. 133), and *Creswill* v. *Knights of Pythias,* 225 U. S. 246 (32 Sup. Ct. 822). In the Iowa case the bill was filed by the secessionists from the order, there having been a schism as here. The plaintiff had incorporated as the defendant has here.    The court first holds that the incorporation under the statute of the State did not give plaintiff the right to the use of the name as against the true Grand Lodge.    The court then proceeds to hold that there was such laches accompanied with strong equities in defendants as to preclude plaintiff from seeking relief in a court of equity in any event.    Thousands of members of defendant had insurance, and the court said:

"Many innocent persons would be compelled to suffer, and much confusion and inconvenience would result to all concerned."

In the *Knights of Pythias Case,* likewise, thousands of members had taken out insurance in the order represented by the defendant, and the bill was not filed until over a quarter of a century after the incorporation of

the order so represented. These cases present a far different situation than the one before us. Let us now refer to some of the facts.

There was litigation in some of the other States. For six years before and for five years after the schism the Grand Lodge in Michigan remained dormant. It was dormant at the time of the schism and did not participate in it. Michigan members were groping around to find which faction was the true order. In 1921 an attempt was made to get together. We fix this date because Mr. Reoch testifies that it was while he was Grand Master and that he was elected in August of that year. In 1923, at least one of the factions hoped and sought a settlement of the differences by the Imperial Council. Indeed the situation did not become acute in Michigan until the spring of 1925. At this time the adherents of Lemmon, who were by far in the minority in this jurisdiction, dissolved the old Grand Lodge corporation, and, claiming to be duly chartered by the true Supreme Lodge of the United States, incorporated under the act of 1895. This was done on March 17th and this bill was filed the following June. It seeks no accounting from the defendant, but only asks that it be protected in the future. We are not persuaded that the facts in the case show such laches on the part of the plaintiff Supreme Lodge as to preclude it from obtaining in a court of equity such protection.

The decree will be affirmed, with costs of this court.

SHARPE, C. J., and BIRD, SNOW, STEERE, WIEST, CLARK, and McDONALD, JJ., concurred.